U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2010 MAY 28 PM 12: 27

BY_____
DEPUTY CLERK

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

JAMES MARONEY, INC., )
    Plaintiff, )
)
v. ) Case No. 5:09-cv-252-cr
)
FLURY & COMPANY, LTD., )
    Defendant. )

**OPINION AND ORDER DENYING DEFENDANT'S MOTIONS TO DISMISS
FOR LACK OF PERSONAL JURISDICTION, IMPROPER VENUE OR, IN THE
ALTERNATIVE, FOR TRANSFER**
(Doc. 4)

    This matter came before the court on April 7, 2010 for oral argument on Defendant, Flury & Company, Ltd.'s ("Flury") pending motions. Flury seeks dismissal of the claims against it, contending that the court lacks personal jurisdiction over it and that venue is improper. In the alternative, Flury seeks transfer of this case to the United States District Court for the Western District of Washington. Plaintiff, James Maroney, Inc. ("JMI"), opposes Flury's motions.

    JMI is represented by Andrew M. Jackson, Esq. Flury is represented by Benjamin W. Putnam, Esq.

    In this case based upon diversity jurisdiction, JMI has filed suit against Flury in the District of Vermont, seeking to recover, among other things, a commission allegedly owed to JMI for a portfolio of photographs sold by Flury to the Amon Carter Museum in Fort Worth, Texas ("ACM").

**I. Jurisdictional Facts.**

    In 1976, JMI was incorporated under New York law. It remains a corporation organized and existing under the laws of the State of New York. JMI is engaged in the art business, acting as a broker to connect buyers and sellers of 19th and 20th century

American art.

At the time of the filing of Flury's motions to dismiss, JMI was not registered with the Vermont Secretary of State to conduct business as a foreign corporation. It has since registered.

JMI's sole shareholder and executive is James H. Maroney, Jr. Mr. Maroney lives in Leicester, Vermont and, since 1999, has conducted JMI's business from that location. In 1999, JMI obtained a Vermont taxpayer identification number. Since at least 2000, it has filed annual state tax returns in Vermont.

Flury is a corporation organized under the laws of the State of Washington, with a principal place of business in Seattle, Washington. Flury operates an art and photography gallery with a particular focus on the photography of Edward S. Curtis. Curtis was a well known photographer of Native Americans. His work has been compiled into portfolios, referred to as Curtis portfolios, that are generally considered collector's items.

Flury has no offices, employees, bank accounts, real estate or property of any kind in the State of Vermont. It is not registered to do business in the State of Vermont, and does not solicit business in Vermont or direct any advertising to Vermont residents.

Lois Flury is Flury's chief executive officer and is personally involved in and familiar with Flury's day-to-day operations. Ms. Flury has never traveled to Vermont for business purposes, and she is not aware of any other Flury officer or employee who has done so.

In March of 2008, JMI was aware of a library in Iowa that wished to sell a set of Curtis portfolios. The leather covers for the set were missing, and JMI sought to find replacement covers. In April of 2008, Mr. Maroney, on behalf of JMI, contacted Lois Flury, on behalf of Flury, to determine whether Flury had or could obtain a set of leather covers for the Iowa Curtis portfolios. These conversations took place on the telephone and via e-mail. In the course of these conversations, JMI disclosed to Flury that it had a buyer who wanted to purchase a set of Curtis portfolios in very good condition with

original covers. Flury was able to find a set of leather covers for the Iowa Curtis portfolios for a purchase price to JMI of $3,775. JMI paid this price and directed Flury to send the covers to JMI in Vermont, and Flury did so.[1] JMI did not disclose to Flury the identity of its potential buyer for the Curtis portfolios, as it considered this proprietary information. In the course of JMI and Flury's discussions regarding the replacement covers, Flury proposed that JMI and Flury become partners in an effort to sell a different set of Curtis portfolios to JMI's buyer in the event that the Iowa set was not acceptable.

JMI presented ACM, an entity with which Mr. Maroney had a 40 year relationship, with the opportunity to purchase the Iowa Curtis portfolios with the replacement covers. ACM inspected the Iowa Curtis portfolios, and ultimately rejected them. ACM nonetheless expressed its continuing interest in obtaining a complete set of Curtis portfolios in excellent condition as it currently possessed only an incomplete set. John Rohrbach, Senior Curator of Photographs at ACM, acted as ACM's representative in these discussions.

Thereafter, JMI resumed discussions with Flury regarding the possibility of a partnership to sell an acceptable set of Curtis portfolios to JMI's buyer. These discussions again took place over the telephone and via e-mail. According to JMI, Flury agreed to work with JMI to find an acceptable set of Curtis portfolios to sell to JMI's buyer, and to share the commission for the sale. In reliance on this alleged agreement, JMI disclosed that ACM was its buyer, and that John Rohrbach was ACM's representative. Flury and its representative, Lois Flury, and ACM and its representative, John Rohrbach, had no prior relationship.

Flury suggested a set of Curtis portfolios in Michigan (the "Cranbrook set") for sale to ACM. Lois Flury performed services to facilitate the sale, including meeting James Maroney and John Rohrbach in Michigan to inspect the Cranbrook set and to

---

[1] At this point, Flury had some notice that it was dealing with an entity operating in the State of Vermont.

negotiate a potential purchase and sale. On or about July 31, 2008, Lois Flury sent an e-mail to James Maroney with the subject line: "RE: Delay?" that states in pertinent part:

> Dear James: I am compiling the information and parts of the data on the Curtis Set # 113 which we will be offering to John Rohrbach, Curator of Photographs at the Amon Carter Museum in Fort Worth, Texas. It will be ready to send off to you via e-mail and FedEx later this afternoon. Do you also want a copy sent off to John Rohrbac[h] so that he would receive the same information as soon as possible?
>
> I have informed Kirk Rudy, my partner regarding the Curtis Set # 113, which belongs to the Cranbrook Institute of Science, that you are my partner in regard to the buying institution. In addition, we have as competitors for this set two auction houses: Christie's and Sotheby's . . . Christie's and Sotheby's will be submitting their individual guarantees to Cranbrook of what the institution would receive net from the auction houses. We must do the same: submit to Cranbrook a net figure to the institution that it would receive from a sale to our client, the Amon Carter Museum. In order to assure that the Amon Carter Museum and we win the bid, we must be in position to bid higher than Christie's or Sotheby's. We also want to receive commissions that reflect our combined abilities to deliver the set to the Amon Carter Museum; the Amon Carter Museum will be paying our commissions; i.e., Cranbrook is asking us to offer them the net figure it will receive. I would like to speak with you concerning the offer price to Cranbrook and our commissions as soon as possible. Also I would like to receive from you an agreement between us regarding the purchase/sale to the Amon Carter Museum of Curtis Set # 113 of The North American Indian. . . .

(Doc. 10-2, Exhibit A.)

ACM rejected the Cranbrook set on the basis of its unsatisfactory physical condition. On September 13, 2008, Lois Flury e-mailed John Rohrbach, copying James Maroney, and inquiring if ACM was still interested in a set of Curtis portfolios:

> Hello, John,
> Week before last I spoke with James Maroney and asked him to be in touch with you to verify that you and the Carter Museum are still interested in acquiring a complete set of Edward Curtis' The North American Indian. Since your decision not to bid on the set I arranged for you to examine in

4

> Michigan, I have been working to arrange for a complete Curtis set
> preferably on Japan Vellum, or perhaps on van Gelder zonen paper made in
> Holland, to offer to you. I believe I am making fine progress in that regard.
> Please confirm that you are indeed still greatly interested and prepared to
> act to purchase it for the museum if it meets with your condition
> requirements.

(Doc. 10-2, Exhibit B). In response, John Rohrbach e-mailed Lois Flury and assured her that ACM was still interested, and that his "charge is to find a set that I consider a match in terms of quality and price and th[e]n return with a proposal to them." *Id.* He forwarded this e-mail to James Maroney, stating that he "meant to send this email to [him] too." *Id.*

Thereafter, Flury located a third set of Curtis portfolios and offered it to ACM, unbeknownst to JMI. In approximately July of 2009, ACM purchased this set for an undisclosed purchase price. James Maroney learned of the sale in approximately October of 2009 and began making inquiries. He contacted John Rohrbach and learned that ACM had acquired the Curtis portfolios through Flury. He then called Lois Flury who initially stated that she did not provide the set of Curtis portfolios that ACM purchased. When Mr. Maroney confronted Ms. Flury with Mr. Rohrbach's statement regarding her involvement, she admitted her involvement but stated it was "supposed to be a secret." She further admitted to discussing with Mr. Rohrbach whether JMI was owed a commission for the sale and determining that it was not. In this same conversation, Ms. Flury denied that she had learned of ACM's interest in purchasing a set of Curtis portfolios from Mr. Maroney.

On November 13, 2009, JMI filed its Complaint, alleging breach of express contract, breach of implied contract, breach of the duty of good faith and fair dealing, breach of fiduciary duty, unjust enrichment/constructive trust, and fraud. JMI seeks compensatory and punitive damages. Flury's motion to dismiss, filed on December 10, 2009, was filed before the parties engaged in discovery. The court's hearing on April 7,

2010 was not evidentiary in nature.

## II. Conclusions of Law and Analysis.

### A. Motion to Dismiss on the Ground Court Lacks Personal Jurisdiction.

Pursuant to Fed. R. Civ. P. 12(b)(2), Flury seeks dismissal of the claims against it, asserting that this court lacks personal jurisdiction over it because Flury does not have the requisite minimum contacts with Vermont, and it would be unreasonable to require it to defend against JMI's claims in this forum.

"On a Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction, the plaintiff bears the burden of showing that the court has jurisdiction over the defendant." *Metropolitan Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 566 (2d Cir. 1996). "Prior to discovery, a plaintiff challenged by a jurisdiction testing motion may defeat the motion by pleading in good faith, *see* Fed. R. Civ. P. 11, legally sufficient allegations of jurisdiction." *Ball v. Metallurgie Hoboken-Overpelt, S.A.*, 902 F.2d 194, 197 (2d Cir.), *cert. denied*, 498 U.S. 854 (1990) (citations omitted). "After discovery, the plaintiff's *prima facie* showing, necessary to defeat a jurisdiction testing motion, must include an averment of facts that, if credited by the trier, would suffice to establish jurisdiction over the defendant." *Id.* "In the absence of an evidentiary hearing on the jurisdictional allegations, or a trial on the merits, all pleadings and affidavits are construed in the light most favorable to the plaintiff," and all inferences are drawn in the plaintiff's favor. *Hoffritz for Cutlery, Inc. v. Amajac, Ltd.*, 763 F.2d 55, 57 (2d Cir. 1985).

Here, Flury has met JMI's "averment of jurisdictional facts . . . by a Rule 12(b)(2) motion, which assumes the truth of the plaintiff's factual allegations for purposes of the motion and challenges their sufficiency." *Ball*, 902 F.2d at 197. Flury supports its motion by the affidavits of its counsel and Lois Flury.[2] JMI, however, has responded by

---

[2] Flury filed the Affidavit of Lois Flury under seal, but its Motion to Dismiss, reciting the statements contained in the Flury Affidavit, was not filed under seal. The court thus relies upon the facts as stated in Flury's motion, as supported by the Flury affidavit.

identifying additional jurisdictional facts by way of James Maroney's affidavit. In its reply memorandum, Flury does not dispute the affidavits provided by JMI, insofar as they are used solely for jurisdictional purposes, and thus this remains a motion to dismiss filed in advance of discovery without an evidentiary hearing. Accordingly, "[a]t [this] preliminary stage, the plaintiff's *prima facie* showing may be established solely by allegations." *Id.* However, the court nonetheless considers the affidavits and supporting materials in its jurisdictional analysis. *See Ben & Jerry's Homemade, Inc. v. Coronet Priscilla Ice Cream Corp.*, 921 F. Supp. 1206, 1209 (D.Vt. 1996).

To determine whether this court may exercise personal jurisdiction over Flury, "the court must look first to the long-arm statute of the forum state, in this instance, [Vermont]." *Bensusan Rest. Corp. v. King*, 126 F.3d 25, 27 (2d Cir. 1997) (citing *PDK Labs, Inc. v. Friedlander*, 103 F.3d 1105, 1108 (2d Cir. 1997)). "If the exercise of jurisdiction is appropriate under that statute, the court then must decide whether such exercise comports with the requisites of due process." *King*, 126 F.3d at 27.

"Vermont's long-arm statute, 12 V.S.A. § 913(b), confers jurisdiction over nonresident defendants to the full extent permitted by the Due Process Clause." *Dall v. Kaylor*, 163 Vt. 274, 275 (1995). Accordingly, the court need only examine "whether the exercise of [specific] jurisdiction comports with federal due process. To do so, [it] undertake[s] an analysis consisting of two components: the 'minimum contacts' test and the 'reasonableness' inquiry." *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 305 F.3d 120, 127 (2d Cir. 2002).

> The first of these tests asks whether the defendant "has 'certain minimum contacts [with the forum] . . . such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice.'" *U.S. Titan, Inc. v. Guangzhou Zhen Hua Shipping Co.*, 241 F.3d 135, 152 (2d Cir. 2001) (quoting *Calder v. Jones*, 465 U.S. 783, 788 [ ] (1984)) (alteration in original; some internal quotation marks omitted). Where the "claim arises out of, or relates to, the defendant's contacts with the forum"-- i.e., specific jurisdiction--minium contacts exist "where the defendant

7

'purposefully availed' itself of the privilege of doing business in the forum and could foresee being 'haled into court' there." *Id.*; *accord Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472-76, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985).

* * *

The second part of the jurisdictional analysis asks "whether the assertion of personal jurisdiction comports with 'traditional notions of fair play and substantial justice'"--that is, whether it is reasonable under the circumstances of the particular case. *Metro. Life* [*Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 568 (2d Cir. 1996)] (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 [ ] (1945)).

*Id.*, 305 F.3d at 127, 129 (footnote omitted).

*1. Whether there are "Minimum Contacts" Sufficient for Specific Jurisdiction.*

In this case, the parties agreed at oral argument that the court need only decide whether specific jurisdiction exists, as there is no factual basis for an exercise of general jurisdiction. At this juncture, however, the parties diverge. JMI asks the court to examine the entirety of the relationship between it and Flury, and to find that their "partnership" pertained not simply to the Cranbrook set but to a joint enterprise to secure an acceptable set of Curtis portfolios for ACM. Flury asks the court to find the parties' dealings with regard to the Iowa set and the Cranbrook set of Curtis portfolios irrelevant as none of these transactions provides the basis for JMI's claims. With regard to the set actually purchased by ACM, Flury contends that it undertook no activities in the State of Vermont and did not reach out to JMI in any manner.

Examining the factual allegations in the light most favorable to JMI, for jurisdictional purposes, the court finds that JMI approached Flury for assistance in securing covers for the Iowa Curtis portfolios. Flury was able to obtain the covers and delivered them to JMI in Vermont. At this point, all contacts were initiated by JMI, and JMI reached out to Flury in Washington. However, also at this point, Flury was on notice that it was dealing with an entity and its representative, both of whom were operating in

Vermont.

JMI further alleges that in the course of this transaction, Flury proposed a partnership to secure an acceptable set of Curtis portfolios for JMI's client. *See Artec Distributing, Inc. v. Video Playback, Inc.*, 799 F. Supp. 1558, 1560 (D.Vt. 1992) (one factor in "minimum contacts" analysis is whether the defendant "actively initiate[d] contacts" in the forum state). When the Iowa set was rejected, JMI accepted Flury's proposal to combine their efforts to find an acceptable set of Curtis portfolios for JMI's client. JMI disclosed the identity of his client, ACM, in reliance on its ongoing relationship with Flury.

The parties' correspondence supports JMI's version of the facts. Lois Flury's e-mail to JMI acknowledges the parties' status as "partners" with regard to at least the Cranbrook set, refers to their sharing of a commission, describes joint positions and actions they must undertake, and proposes that JMI send her a written agreement with regard to the Cranbrook set sale to "our client" ACM. In furtherance of this arrangement, Mr. Maroney, Ms. Flury, and Mr. Rohrbach all traveled to Michigan to inspect the Cranbrook set which ACM ultimately rejected.

Thereafter, Ms. Flury e-mailed representatives for both JMI and ACM, noting that she has been discussing the matter with Mr. Maroney, and seeking confirmation from ACM that she should continue to look for an acceptable set of Curtis portfolios for ACM. In this e-mail, she acknowledges that ACM has rejected the Cranbrook set, which belies Flury's claim that any JMI-Flury partnership was confined to the Cranbrook set. On behalf of ACM, Mr. Rohrbach confirmed that ACM remained interested. He ensured that JMI also received this confirmation. Within the year, Flury found and sold an acceptable set of Curtis portfolios to ACM, without disclosing that transaction to JMI and without sharing any part of the commission.

The contacts between Flury and JMI in the course of their alleged "partnership"

took place in person, on the telephone, via e-mail and through the mail.[3] They did not involve a single transaction but represented a course of conduct in order to achieve a joint objective which they both acknowledged: to locate and sell to ACM, their mutual client, an acceptable set of Curtis portfolios. JMI's claims arise out of these facts and circumstances.

Although Flury contends that JMI is a New York resident, JMI has alleged sufficient facts to establish that its principal place of business is in Vermont. As the Court recently explained in *Hertz Corp. v. Friend*, 130 S. Ct. 1181 (2010), in construing 28 U.S.C. § 1332(c)(1):

> We conclude that "principal place of business" is best read as referring to the place where a corporation's officers direct, control, and coordinate the corporation's activities. It is the place that Courts of Appeals have called the corporation's "nerve center." And in practice it should normally be the place where the corporation maintains its headquarters--provided that the headquarters is the actual center of direction, control, and coordination, *i.e.*, the "nerve center," and not simply an office where the corporation holds its board meetings (for example, attended by directors and officers who have traveled there for the occasion).

*Id.* at 1192; *see also C.T. Carden v. Arkoma Assoc.s*, 494 U.S. 185, 195 (1990) (citizenship of partnership is based upon the citizenship of the partners); *Schiavone Construction Co. v. City of New York*, 99 F.3d 546, 548 (1996) ("For diversity purposes, the citizenship of a joint venture is the citizenship of each of its members.").

The court thus examines Flury's contacts with Vermont in furtherance of the alleged "partnership" to determine whether they were "attenuated" and "isolated" or constituted "purposeful availment" of the protections of the forum state. *See Burger King*, 471 U.S. at 479. As the United States Supreme Court has explained:

---

[3] *See Grand Entm't Group Ltd. v. Star Media Sales, Inc.*, 988 F.2d 476, 482 (3d Cir. 1003) ("Mail and telephone communications sent by the defendant into the forum may count toward the minimum contacts that support jurisdiction.").

10

we have emphasized the need for a "highly realistic" approach that recognizes that a "contract" is "ordinarily but an intermediate step serving to tie up prior business negotiations with future consequences which themselves are the real object of the business transaction." It is these factors--prior negotiations and contemplated future consequences, along with the terms of the contract and the parties actual course of dealing--that must be evaluated in determining whether the defendant purposefully established minimum contacts within the forum.

*Burger King*, 471 U.S. at 479 (citation omitted); *see also Remick v. Manfredy*, 238 F.3d 248, 256 (3d Cir. 2001) ("In determining jurisdiction over a breach of contract claim, [the court] must consider the totality of the circumstances, including the location and character of the contract negotiations, the terms of the contract, and the parties' actual course of dealing."). Jurisdiction is proper where parties "reach out beyond one state and create continuing relationships and obligations with citizens of another state." *Travelers Health Assn. v. Virginia*, 339 U.S. 643, 647 (1950).

Here, the requisite "minimum contacts" are present. Flury reached out to JMI in Vermont to create an ongoing joint venture to secure an acceptable set of Curtis portfolios for ACM in exchange for a share of the commission arising out of a sale of the same. In doing so, Flury purposefully directed its activities to a citizen of the forum state and created continuing obligations to it. Its efforts in this respect were neither random nor fortuitous, but rather were purposeful and intentional. It was not an isolated transaction but one that took place over a period of several months with multiple contacts in the interim--many of which were directed to JMI and Mr. Maroney in Vermont. The "purposeful availment" requirement for "minimum contacts" is satisfied by such evidence:

> [w]here a forum seeks to assert specific jurisdiction over an out-of-state defendant who has not consented to suit there, this "fair warning" requirement is satisfied if the defendant has "purposefully directed" his activities at residents of the forum and the litigation results from alleged injuries that "arise out of or relate to" those activities.

*Burger King*, 471 U.S. at 472 (footnote and citations omitted).

Having found that JMI has established a *prima facie* showing on the first jurisdictional prong, the court examines whether it has also satisfied the second prong although here the burden of persuasion shifts.

2. *Whether it is Reasonable for Vermont to Exercise Personal Jurisdiction over Flury.*

"The second part of the jurisdictional analysis asks 'whether the assertion of personal jurisdiction comports with "traditional notions of fair play and substantial justice"--that is, whether it is reasonable under the circumstances of the particular case.'" *Bank Brussels Lambert*, 305 F.3d at 129 (quoting *Metro. Life*, 84 F.3d at 568 and *Int'l. Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)).

> Courts are to consider five factors in evaluating reasonableness: "(1) the burden that the exercise of jurisdiction will impose on the defendant; (2) the interests of the forum in adjudicating the case; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of the controversy; and (5) the shared interest in the states in furthering substantive social policies."

*Bank Brussels Lambert*, 305 F.3d at 129 (citations omitted).

"Where a plaintiff makes the threshold showing of minimum contacts required for the first test, a defendant must present 'a compelling case that the presence of some other considerations would render jurisdiction unreasonable.'" *Id.* (quoting *Metro Life*, 84 F.3d at 568 and *Burger King*, 471 U.S. at 477); *see also Asahi Metal Indus. Co., Ltd. v. Superior Court of California*, 480 U.S. 102, 114 (1987) ("When minimum contacts have been established, often the interests of the plaintiff and the forum in the exercise of jurisdiction will justify even serious burdens placed on the alien defendant.").

Here, Flury fails to sustain its burden of proof. Although it is undoubtedly inconvenient for Flury to litigate in Vermont, Flury cites no facts or circumstances that will impact its ability to effectively defend against JMI's claims in the forum. *See Bank*

*Brussels Lambert*, 305 F.3d at 129-30 ("Even if forcing the defendant to litigate in a forum relatively distant from its home base were found to be a burden, the argument would provide defendant only weak support, if any, because 'the conveniences of modern communication and transportation ease what would have been a serious burden only a few decades ago.'") (citation omitted).

Vermont is able to afford JMI both convenient and effective relief and has an interest in ensuring an available forum for the litigation of JMI's claims. *See Real Good Toys, Inc. v. XL Machine, Ltd.*, 163 F. Supp.2d 421, 425 (D.Vt. 2001) ("In particular, Vermont has an important interest in protecting its citizens'. . . business interests.").

Flury's preferred forum, the Western District of Washington, has no greater interest in this litigation than Vermont. It offers no compelling advantages to either the witnesses or to the effective administration of justice. As Mr. Maroney and Ms. Flury, together with John Rohrbach, are likely to be the principal, if not the sole, witnesses, the interstate judicial system's interest in obtaining the most efficient resolution of the controversy[4] will not be advanced by a change in forum. *See Bank Brussels Lambert*, 305 F.3d at 130 (the fact that 'both jurisdictions are marked with the traces of the transactions in issue" "both supports and undermines defendant's position" regarding the most convenient forum).

In summary, Flury's showing with regard to the reasonableness factors is not sufficient "to convince [the court] that this case is the 'exceptional situation' where exercise of personal jurisdiction is unreasonable even though minimum contacts are present." *Bank Brussels Lambert*, 305 F.3d at 130.

## B. Motion to Dismiss on the Grounds that Venue is Improper.

Pursuant to Fed. R. Civ. P. 12(b)(3), Flury seeks dismissal on the ground of

---

[4] In analyzing this factor, the courts "generally consider where evidence and witnesses are likely to be located." *Kernan v. Kurz-Hastings, Inc.*, 175 F.3d 236, 245 (2d Cir. 1999) (quotation omitted).

improper venue. 28 U.S.C. § 1391(a)(1) provides that venue is appropriate in "a judicial district where any defendant resides, if all defendants reside in the same State[.]" "For venue purposes, a corporation shall be deemed to reside in any judicial district in which it is subject to personal jurisdiction at the time the action is commenced." 28 U.S.C. § 1391©. Accordingly, because the court exercises personal jurisdiction over Flury, venue is proper in the District of Vermont. Flury's motion to dismiss for improper venue is therefore DENIED.

**C. Motion in the Alternative to Transfer.**

Flury requests under both 28 U.S.C. § 1406(a) and § 1404(a) that if JMI's claims are not dismissed outright, they be transferred to the Western District of Washington. Under § 1406(a), "[t]he district court of a district in which is filed a case laying venue in the wrong division or district shall dismiss, or if it be in the interest of justice, transfer such case to any district or division in which it could have been brought." Because § 1406(a) is triggered only if venue is improper, it has no application here.

Under § 1404(a), "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." Flury bears the burden of establishing that the action should be transferred to a different forum. *See D.H. Blair & Co. v. Gottdiener*, 462 F.3d 95, 106-107 (2d Cir. 2006). Factors a district court should consider in deciding whether to transfer are:

> (1) the plaintiff's choice of forum, (2) the convenience of witnesses, (3) the location of relevant documents and relative ease of access to sources of proof, (4) the convenience of parties, (5) the locus of operative facts, (6) the availability of process to compel the attendance of unwilling witnesses, [and] (7) the relative means of the parties.

*Id.* "Absent a clear and convincing showing that the balance of convenience strongly favors an alternate forum, discretionary transfers are not favored." *Tom and Sally's Handmade Chocolates, Inc. v. Gasworks, Inc.*, 977 F. Supp. 297, 302 (D.Vt. 1997).

14

As noted, the parties, witnesses, locus of operative facts, and evidence in this case are spread equidistant across the United States: JMI and James Maroney are in Vermont; Flury and Lois Flury are in Washington; and ACM and John Rohrbach are in Texas. The alleged agreement between JMI and Flury was reached over the telephone and via the Internet by the parties presumably operating from their home states. In the absence of financial information regarding the parties, the court concludes that the burden of traveling to the host forum would be virtually identical for each party. The balance of convenience and hardships is thus roughly equivalent.

JMI, however, has chosen Vermont as the forum in which it seeks to bring its claims and that choice is entitled to substantial weight. *See Bridgeport Machines, Inc. v. Alamo Iron Works, Inc.*, 76 F. Supp. 2d 214, 217 (D.Conn. 1999) ("Since [plaintiff] has filed this action in the state where it resides and maintains its principal place of business, its chosen forum is entitled to substantial consideration.").

Because there is no clear and convincing evidence that militates in favor of a transfer of this action to the Western District of Washington, Flury's motion in the alternative to transfer must be DENIED.

SO ORDERED.

Dated at Burlington, in the District of Vermont, this 28th day of May, 2010.

Christina Reiss
United States District Court Judge