U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

2011 OCT -6 PM 3: 06

CLERK

BY ___PM___
DEPUTY CLERK

JAMES MARONEY, INC.,          )
                              )
            Plaintiff,        )
                              )
      v.                      )     Case No. 5:09-cv-252
                              )
FLURY & COMPANY, LTD.,        )
                              )
            Defendant.        )

## OPINION AND ORDER DENYING DEFENDANT'S MOTION FOR JUDGMENT AS A MATTER OF LAW, FOR A NEW TRIAL, AND/OR TO ALTER OR AMEND THE JUDGMENT
### (Doc. 68)

This matter comes before the court on Defendant Flury & Company, Ltd.'s ("Flury") motion pursuant to Fed. R. Civ. P. 50(b) and 59 for judgment as a matter of law, or in the alternative, to alter or amend the judgment and/or for a new trial (Doc. 68). Plaintiff James Maroney, Inc. ("Maroney") opposes the motions. The parties waived oral argument.

### I.      Factual and Procedural Background.

This case arises out of a dispute regarding whether Flury, an art dealer, owes Maroney, also an art dealer, a portion of the commission Flury received in connection with the purchase and sale of a set of Curtis portfolios[1] to the Amon Carter Museum ("ACM"). Maroney's Complaint alleges breach of express contract, breach of implied contract, breach of the duty of good faith and fair dealing, breach of fiduciary duty, unjust enrichment/constructive trust, and fraud. In its prayer for relief, Maroney seeks compensatory and punitive damages, as well as equitable relief.

---

[1] The portfolios consist of photogravures of the "North American Indian" and are generally considered to have historic as well as artistic value.

The court held a jury trial[2] on July 5-7, 2011.  Examining the evidence in the light most favorable to the prevailing party,[3] the evidence presented at trial may be summarized as follows.

In the spring of 2008, Maroney was working with a library in Iowa that wished to sell its set of Curtis portfolios.  The leather covers for the set were missing, and Maroney was tasked with finding replacement covers.  He did so by contacting Flury, an art dealer which specializes in Curtis portfolios.  Flury located suitable covers which Maroney purchased.  In the course of their discussions, Maroney disclosed to Flury that it had a buyer who wanted to purchase a set of Curtis portfolios in very good condition with original covers.  Maroney did not disclose to Flury the identity of its potential buyer, as it considered this proprietary information.  ACM was the buyer in question and had worked with Maroney on other projects.  John Rohrbach, Senior Curator of Photographs at ACM, acted as ACM's representative.

Thereafter, ACM inspected the Iowa library's Curtis portfolios with the replacement covers and made an offer for them.  The Iowa library then became conflicted as to whether it wanted to sell the set to an outside institution.  On June 25, 2008, Maroney sent the following e-mail to Flury:

> Dear Lois: My buyer made an offer to my seller which did not take action on it yesterday at their board meeting.  Seller is conflicted and buyer is ready.  So you mentioned you may have a beautiful complete set on vellum paper for sale; do you?

---

[2]  The court's jury trial pertained only to Maroney's legal claims, however, with the parties' consent, the court submitted to the jury a special verdict form that allowed the jury to provide an advisory opinion with regard to two facets of Maroney's equitable claims: Did Defendant receive any benefit from Plaintiff's disclosure that the Amon Carter Museum was an interested buyer? Did the Defendant improve its position at the Plaintiff's expense?  The jury answered both of these questions in the affirmative.

[3] *See Black v. Finantra Capital, Inc.*, 418 F.3d 203, 208-09 (2d Cir. 2005) (instructing the court, when reviewing a Rule 50 motion for judgment as a matter of law, to "consider the evidence in the light most favorable to the party against whom the motion was made and . . . give that party the benefit of all reasonable inferences that the jury might have drawn in his favor from the evidence.") (internal quotation marks omitted).

(Exhibit 1 at 33).

The Iowa library set deal ultimately fell through. ACM nonetheless expressed its continuing interest in obtaining a complete set of Curtis portfolios in excellent condition. In response, Maroney resumed discussions with Flury regarding the sale of an acceptable set of Curtis portfolios to Maroney's buyer, telling Flury: "We are in business with your Curtis." (Exhibit 1 at 40.) The parties' discussions took place over the telephone and via e-mail. According to Maroney, Flury agreed to find an acceptable set of Curtis portfolios to sell to Maroney's buyer and to share the commission for the sale on a 50/50 basis. In reliance on this agreement, Maroney disclosed to Flury that ACM was its buyer, and that John Rohrbach was ACM's representative. By e-mail dated July 30, 2008, Maroney advised Flury: "I told John Rohrbach, Curator of Photographs at the Amon Carter Musuem that you were my partner in supplying this Curtis[.]" (Exhibit 1 at 40A). Flury and ACM had no prior relationship. In addition, Flury had no prior contact with Mr. Rohrbach.

Flury suggested a set of Curtis portfolios in Michigan (the "Cranbrook set") for sale to ACM. Lois Flury performed services to facilitate the sale, including meeting James Maroney and John Rohrbach in Michigan to inspect the Cranbrook set and to negotiate a potential purchase and sale. On or about July 31, 2008, Lois Flury sent an e-mail to James Maroney with the subject line: "RE: Delay?" that states in pertinent part:

> Dear James: I am compiling the information and parts of the data on the Curtis Set # 113 which we will be offering to John Rohrbach, Curator of Photographs at the Amon Carter Museum in Fort Worth, Texas. It will be ready to send off to you via e-mail and FedEx later this afternoon. Do you also want a copy sent off to John Rohrbac[h] so that he would receive the same information as soon as possible?
>
> I have informed Kirk Rudy, my partner regarding the Curtis Set # 113, which belongs to the Cranbrook Institute of Science, **that you are my partner in regard to the buying institution. . . .** In order to assure that the Amon Carter Museum and we win the bid, we must be in position to bid higher than Christie's or Sotheby's. We also want to receive commissions that reflect our combined abilities to deliver the set to the Amon Carter Museum; the Amon Carter Museum will be paying our commissions; i.e.,

3

> Cranbrook is asking us to offer them the net figure it will receive. I would like to speak with you concerning the offer price to Cranbrook and our commissions as soon as possible. Also I would like to receive from you an agreement between us regarding the purchase/sale to the Amon Carter Museum of Curtis Set # 113 of The North American Indian. . . .

(Exhibit 1 at 41) (emphasis supplied). At trial, Flury denied any intent to form a partnership with Maroney with regard to ACM and claimed the only agreement they had reached was the following written e-mail agreement with regard to the Cranbrook set.

> In the meantime, please forward to me the agreement we reached earlier today by phone regarding our splitting the total commission from the buyer institution and each paying $50,000 to Kirk [Rudy]. As I have explained, our offer on behalf of the buyer institution will be for a net figure to it; there is no commission to be received from it. Since you have discussed 25% to 30% with the curator representing the institution, that should be adequate for all parties; and, as discussed, you will deal with the buyer institution regarding the appropriate figures and communicate that to me. Kirk and I will deal with the selling institution regarding the offer bid; and I will communicate with you regarding that. At the appropriate time we can disclose to the buyer institution all the figures it may want to know. I would appreciate having our agreement via email this evening or very early morning tomorrow since we have not committed that to writing yet . . . . You can give me my hard copy of the agreement when we meet Wednesday morning for breakfast.

(Exhibit 1 at 50). The next day, Maroney responded as follows:

> Lois: I am pleased with the agreement you outline below, which is that I will charge the Amon Carter Museum a commission of 25-30% over and above their purchase price for the Cranbrook Curtis set. If their bid is successful, I will split the commission evenly with you and we will each pay Kirk Rudy $50,000 of his $100,000 fee.

(Exhibit 1 at 50). The parties reached no other written agreement and never exchanged a "hard copy" or signed copy of their agreement.

ACM ultimately rejected the Cranbrook set on the basis of its unsatisfactory physical condition. After making some efforts to persuade ACM to reconsider, on August 11, 2008, Flury sent Maroney an e-mail discussing these efforts and noting: "In the meantime, James [Maroney], I've already begun my task of locating a different set,

hopefully one that is all Japan Vellum. I'll keep you posted." (Exhibit 1 at 59). At trial, Flury denied that it had been tasked with finding a different set of Curtis portfolios and denied any agreement to continue to work with Maroney in this regard.

On September 13, 2008, Flury e-mailed John Rohrbach, copying Maroney, and inquiring if ACM was still interested in a set of Curtis portfolios:

> Hello, John,
>
> Week before last I spoke with James Maroney and asked him to be in touch with you to verify that you and the Carter Museum are still interested in acquiring a complete set of Edward Curtis' The North American Indian. Since your decision not to bid on the set I arranged for you to examine in Michigan, I have been working to arrange for a complete Curtis set preferably on Japan Vellum, or perhaps on van Gelder zonen paper made in Holland, to offer to you. I believe I am making fine progress in that regard. Please confirm that you are indeed still greatly interested and prepared to act to purchase it for the museum if it meets with your condition requirements.

(Exhibit 1 at 60). In response, John Rohrbach e-mailed Flury and confirmed that ACM was still interested, and that his "charge is to find a set that I consider a match in terms of quality and price and th[e]n return with a proposal to [his employer]." *Id.* He forwarded this e-mail to James Maroney, stating that he "meant to send this email to [him] too." *Id.*

In November of 2008, Flury located a third and fourth set of Curtis portfolios and asked whether ACM was interested. This contact occurred unbeknownst to Maroney. John Rohrbach asked Flury in writing whether there would be more than one dealer involved. In response, Flury advised that although she was "originally introduced to [ACM] by James Maroney," Flury had attempted to contact Maroney with no reply and only then contacted ACM directly. (Exhibit 3 at 63). She stated to John Rohrbach: "You can tell me if you think I should share a commission with James [Maroney], which I am sure he would want to be larger." *Id.* In response, Mr. Rohrbach advised: "We consider this current Curtis set purchase possibility distinctly separate from the Cranbrook matter and do not feel that James Maroney needs to be involved." (Exhibit 3 at 65). Mr. Rohrbach, however, asked Flury to ensure that it discussed this matter with

Maroney.  At trial, Flury testified that it had tried to reach Maroney numerous times and received no reply.  Maroney introduced into evidence telephone records that undermined this claim.  *See* Exhibit 8.

In approximately March of 2009, ACM purchased a set of Curtis portfolios, generating total professional fees in the amount of $212,500 to Flury.  At trial, Flury admitted discussing with Mr. Rohrbach whether Maroney was owed a commission for the sale.  In an e-mail to individuals at ACM, John Rohrbach summarized his understanding of the situation as follows:

> I am not, and never have been privy to J [Maroney]'s arrangement with Lois Flury.  When she approached me about the Curtis set owned by [confidential seller] (the set we recently purchased), I asked her directly and at the start of our conversation, would James Maroney be involved in this transaction?  She explained that she was not under contract with him and that she felt no obligation to bring him in.  She was concerned, as I was about the increased dealer fee brought about by having to work with two dealers on a purchase . . . Lois told me that as a courtesy, she would call J [Maroney] and let him know of her continuing conversations with me.  I asked her on several occasions whether she had reached J [Maroney], and she explained that she had placed multiple calls to him but that he had never returned any of them.  She told me that she finally gave up and assumed he did not want to be involved with her.  My questions to her came not from any sense that we were required to bring J. [Maroney] into the deal.  Rather they were induced by my wanting to be absolutely clear about who we were working with on this prospective purchase.

(Exhibit 3 at 107.)

In approximately October of 2009, Maroney learned of the sale to ACM. Maroney contacted John Rohrbach, who confirmed that ACM had acquired the Curtis portfolios through Flury.  Maroney then telephoned Flury who initially stated that it did not provide the set of Curtis portfolios that ACM purchased, but when confronted further admitted that it had in fact been the dealer on the sale.  At trial, Flury further testified that the reason why it did not disclose the sale to ACM to Maroney was because a confidentiality agreement prevented her from doing so.  Maroney argued that Flury had

6

agreed to the confidentiality agreement only to protect its own interests—a claim Flury denied.

Flury further denied that any commission was due and owing to Maroney and denied that the parties had reached any agreement other than the written agreement with regard to the Cranbrook set. She testified that she did not enter into oral agreements as a matter of practice, especially where, as here, she had only a limited acquaintance with the other party.

Both parties introduce testimony from expert witnesses regarding whether it is customary for art dealers to enter into oral versus written contracts. Maroney's expert witness testified that art dealers routinely enter into oral contracts, although he recalled that he had entered into a written contract on a couple occasions. Flury's expert witness testified that art dealers customarily enter into written contracts, although he admitted he had entered into oral contracts as well.

Finally at trial, Flury denied that she had learned of ACM as a potential buyer for the Curtis portfolios through Maroney. Instead, she testified that she had known this information prior to its disclosure by Maroney but said nothing about it because there was no point in doing so. She testified that she had learned this information some years prior at an art auction and that it was well known in the industry that ACM was looking for a set of Curtis portfolios. Flury's expert witness, Kirk Rudy, characterized himself as one of the nation's leading dealers in Curtis portfolios. He denied knowing of ACM's interest in acquiring a set of Curtis portfolios prior to this lawsuit.

## A.  Defendant's Motion in Limine.

Both prior to trial and at trial, Flury sought exclusion of any evidence of any alleged oral agreement between the parties, arguing that such evidence was barred by the parol evidence rule as a prior and contemporaneous agreement or negotiation that attempted to vary the terms of the parties' written agreement. (Doc. 44.) Flury contended that the only agreement between the parties was the written, albeit unsigned, e-mail agreement with regard to the Cranbrook set.

Maroney opposed Flury's motion in limine, arguing that the parties' e-mails: (1) did not constitute a fully integrated written agreement; (2) were ambiguous; and (3) were undermined by substantial evidence that supported a conclusion that the parties intended their agreement to act as partners to extend beyond the sale of the Cranbrook set in the event that sale fell through. (Doc. 45.) In an "Additional Response," Maroney further argued that even if evidence of an oral agreement was inadmissible on its breach of contract claim, it remained admissible on Maroney's breach of implied contract, unjust enrichment, breach of fiduciary duty, and fraud claims. (Doc. 47.)

In response, Flury conceded that the agreement for the Cranbrook set was not fully integrated. *See* Doc. 51 at 2 ("In this case, Plaintiff is correct that the parties' written agreement is a partially integrated agreement, not a fully integrated agreement, since it leaves certain details to be worked out by subsequent agreement of the parties.") (footnote omitted). Flury argued, however, that the agreement remained integrated in that it pertained only to the Cranbrook set. Flury further contended that any evidence of an oral agreement was inadmissible with regard to Maroney's other claims either because of the parol evidence rule or because such evidence was irrelevant.

The court denied Flury's motion in limine, ruling that the parol evidence rule did not apply because the parties' written agreement with regard to the Cranbrook set clearly governed *only that transaction* and was not fully integrated. There was also evidence that the parties continued to work jointly towards finding another set of Curtis portfolios after the Cranbrook transaction fell through. Accordingly, evidence of their oral agreements was admissible to explain the full extent of the parties' relationship. Moreover, it was with regard to a *subsequent* transaction, for which neither party claimed to have a written agreement, that Plaintiff had filed suit.

**B.  Defendant's Motion for Judgment as a Matter of Law.**

At the close of Maroney's case, Flury moved for judgment as matter of law pursuant to Fed. R. Civ. P. 50(a). Flury argued that there was insufficient evidence upon which a reasonable jury could return a verdict in favor of Maroney on any count of the Complaint. The court heard argument and denied the motion for the reasons stated on the

record.  Following the close of evidence, Flury renewed its motion for judgment as a matter of law on all counts of the Complaint.  The court heard arguments and again denied the motion for the reasons stated on the record.

At the conclusion of the jury trial, the jury returned a verdict in favor of Maroney on its breach of implied contract and breach of the implied covenant of good faith and fair dealing claims.  The jury awarded $50,000 in damages on each claim for a total award of $100,000.  The court entered judgment on the verdict on July 14, 2011.[4]

Flury now renews its motion for judgment as a matter of law and also moves, in the alternative, to alter or amend the judgment or for a new trial.

## II.    Conclusions of Law and Analysis.

### A.    Motion for Judgment as a Matter of Law.

Fed. R. Civ. P. 50 governs judgment as a matter of law in jury trials.  If a party has been fully heard on an issue during a jury trial, and the court finds that no reasonable jury would have a reasonably sufficient evidentiary basis to find for the party on a particular issue or issues, the court may resolve the issue against the non-moving party and grant it judgment as a matter of law.  The threshold for granting such a motion contrary to a jury's verdict is a high one.  *See Toporoff Eng'rs, P.C. v. Fireman's Fund Ins. Co.*, 371 F.3d 105, 108 (2d Cir. 2004).  The court must find that "there is such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture" or be contrary to "an overwhelming amount of evidence" in favor of the moving party such that "reasonable and fair minded" jurors could not reach the same verdict.  *Harris v. Niagara Mohawk Power Corp.*, 252 F.3d 592, 597 (2d Cir. 2001).  In making this determination, the court "must draw all

---

[4]  The jury did not find in favor of Maroney on its express contract, breach of fiduciary duty, and fraud claims.  In addition, the court has not yet entered a judgment on Maroney's equitable claims.  In light of this Opinion and Order, the court gives notice to the parties that it intends to dismiss Maroney's equitable claims, finding that Maroney has not established that it does not have an adequate remedy at law.  The parties have twenty (20) days from the date of this Order to oppose dismissal.

reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Id.* The moving party "must specify the judgment sought and the law and facts that entitle the movant to the judgment." Fed. R. Civ. P. 50(a)(2).

### 1. Implied Contract Claim.

Neither party objected to the court's jury instruction regarding Maroney's implied contract claim.[5] Moreover, both parties agree that in order for Maroney to meet its burden of proof, it would need to demonstrate evidence of "established past pratices,

---

[5] The court charged the jury as follows:

Plaintiff alleges that if you find there is no written contract between the parties, you should find that an implied contract existed between the parties based upon their course of dealings. Plaintiff alleges that there was an implied contract between it and the Defendant to split the commission on a sale of Curtis portfolios to the Amon Carter Museum.

An implied contract may arise through established past practices, where the conduct of the parties encompasses a continuity, interest, purpose and understanding which elevates a course of action to implied contractual status. It is a contract that is inferred from the conduct, acts, or relation of the parties, instead of being inferred from their spoken words. There are, however, several limitations.

First, the past practices must be well-established and consistent with any written contract between the parties. In other words, the implied contract cannot be in conflict with the parties' written agreement if you find one exists. Second, you must find that all of the material terms of the implied contract have been established.

In this case, in order to prove a breach of implied contract claim, Plaintiff must establish the following elements:

1. The parties' past practices established a mutual understanding and expectation that they would share the commission for the sale of any Curtis portfolios located by Defendant and offered to the Amon Carter Museum;
2. Defendant failed to act in accordance with the parties' mutual understanding and expectation; and
3. As a proximate cause of Defendant's failure, Plaintiff suffered damages in a quantifiable amount.

If you find that Plaintiff has proved by a preponderance of the evidence each of the elements of an implied contract claim, you must return a verdict for Plaintiff on this claim. If you find that Plaintiff has not established each of the elements of an implied contract claim, you must return a verdict for Defendant on this claim.

where the conduct of the parties . . . encompass[ed] a continuity, interest, purpose and understanding which elevates a course of action to an implied contractual status." *In re Cole*, 2008 VT 58, ¶ 13, 184 Vt. 64, 71, 954 A.2d 1307, 1311.

Flury claims that there is no evidence to support an implied contract between the parties because no prior practices existed between the parties that would supply the contract terms. Maroney counters that from the quest for replacement covers for the Iowa library set through the ongoing search for an acceptable set of Curtis portfolios for ACM, the parties acted as joint venturers with a single objective which elevated their conduct to the status of an implied contract to share the commission equally if and when an acceptable set was found.

Here, the court finds that there was ample evidence to support Maroney's theory of implied contract. The parties' dealings pre-existed and post-dated the failed sale of the Cranbrook set and included a representation by Flury that Maroney was its partner in conjunction with ACM. Having once negotiated a $50,000 commission for each of them with regard to the Cranbrook set, the parties did not renegotiate the split of the commission between them further although they continued to work together to find another set. In September 2009, Flury advised Maroney that she continued to work on her task to find an acceptable set of Curtis portfolios and that she would keep Maroney "posted."

Although Flury claims, without citation to authority, that "a single transaction by itself cannot serve as a pattern or course of conduct," (Doc. 70 at 4), this was not a single transaction. Instead, it was a course of dealings between the parties that occurred over a number of months, took place in numerous telephone calls and e-mails, and pursued a single objective: to find an acceptable set of Curtis portfolios to sell to ACM for which both parties would share in the commission.

Because there is not such an overwhelming amount of evidence in favor of Flury that reasonable and fair minded persons could not arrive at a verdict in Maroney's favor, *Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp.*, 136 F.3d 276, 289 (2d Cir. 1998),

Flury's motion for judgment as a matter of law on Maroney's implied contract claim must be DENIED.

### 2. **Breach of the Implied Covenant of Good Faith and Fair Dealing Claim.**

Flury's motion is equally unavailing with regard to the breach of the implied covenant of good faith and fair dealing claim. Flury is correct that "[a] cause of action for breach of the covenant of good faith can arise only upon a showing that there is an underlying contractual relationship between the parties[.]" *Harsch Props.s, Inc. v. Nicholas*, 2007 VT 70, ¶ 14, 182 Vt. 196, 202, 932 A.2d 1045, 1050 (citing *Monahan v. GMAC Mort. Corp.*, 2005 VT 110, ¶ 54 n.5, 179 Vt. 167, 187, 893 A.2d 298, 316); *accord Brown v. Windham Northeast Supervisory Union*, 2006 WL 2548198, at *16 (D. Vt. Aug. 31, 2006) ("The implied covenant of good faith and fair dealing arises only between parties to a contract."); *Peerless Ins. Co. v. Frederick*, 2004 VT 126, ¶ 15, 177 Vt. 441, 446, 869 A.2d 112, 116 ("[T]he duty of good faith and fair dealing arises solely because of the presence of the . . . contract.") (citation omitted). Here, however, the jury reasonably found an implied contract between the parties—a conclusion which the court has ruled is supported by sufficient evidence.

Flury's second challenge is to the alleged absence of any evidence that her actions were motivated by bad faith.[6] Her motive, however, was for the jury to determine based upon

---

[6] Neither party objected to the court's jury instruction:

Plaintiff claims that Defendant breached a duty of good faith and fair dealing. Parties in a contractual relationship have an obligation to treat each other in good faith and deal with each other fairly. This is known as the covenant of good faith and fair dealing, and it is implied in every contract. You need not address this claim if you find that the parties did not enter into an agreement.

The definition of the "covenant of good faith and fair dealing" is broad. It is an underlying principle implied in every contract that each party promises not to do anything to undermine or destroy the other's rights to receive the benefits of the agreement. The implied covenant of good faith and fair dealing exists to ensure that parties to a contract act with faithfulness to an agreed common purpose and consistently with the justified expectations of the other party. The factual question in this case was whether each party acted in good faith and dealt fairly and consistently with the justified expectations of the other in the performance of their alleged agreement.

all of the facts and circumstances. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (stating "[c]redibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.").

     Examining the evidence in the light most favorable to the verdict, a reasonable jury could find that Flury did not act in good faith with regard to failing to advise Maroney that she intended to continue to deal with ACM unilaterally, by misrepresenting her efforts to contact Maroney to John Rohrbach, by arguably falsely claiming that she already knew of ACM's interest before Maroney identified its buyer, by concealing the sale to ACM and thereafter denying her involvement to Maroney, and by falsely claiming that she only did business in writing when in fact the parties' own course of conduct belied that claim. Each aspect of this conduct was conduct beyond the mere breaching of the parties' implied contract and arguably constituted "bad faith." The jury concluded that Maroney was harmed in the amount of $50,000 for this bad faith in addition to the

---

The covenant of good faith and fair dealing protects against a variety of conduct that violates community standards of decency, fairness, or reasonableness. A complete catalogue of types of bad faith conduct is impossible, but the following types of conduct are among those which may violate the covenant: evasion of the spirit of the bargain, lack of diligence and slacking off, willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance. Further, bad faith may be found in harassing demands for assurances of performance, rejection of performance for unstated reasons, willful failure to mitigate damages, and abuse of the power to determine compliance or to terminate the contract. Additionally, subterfuges and evasions may constitute bad faith even though the actor believes his conduct to be justified. Finally, the covenant also extends to dealing which is candid but unfair, such as taking advantage of the necessitous circumstances of the other party.

In the end, it is your obligation as jurors to judge the context of the alleged bad faith conduct to determine if Defendant violated the covenant of good faith and fair dealing. You should consider the totality of the facts and circumstances, including the terms of any agreement between the parties in making this determination.

You must also find that as a result of the breach of the implied covenant of good faith and fair dealing, Plaintiff suffered damages in a quantifiable amount.

If you find that Plaintiff has established by a preponderance of the evidence a breach of the implied covenant of good faith and fair dealing, you must return a verdict for Plaintiff on this claim. If you find that Plaintiff has not proved this claim by a preponderance of the evidence, you must return a verdict for Defendant.

$50,000 injury it suffered as a result of Maroney's breach of the implied contract. Together these amounts represent approximately one half the commission Flury received with regard to the sale to ACM.

Because there is not such an overwhelming amount of evidence in favor of Flury that reasonable and fair minded persons could not arrive at the same verdict in favor of Maroney, *Galdieri-Ambrosini*, 136 F.3d at 289, Flury's motion for judgment as a matter of law on Maroney's implied covenant of good faith and fair dealing claim must be DENIED.

Having found a sufficient evidentiary basis for the verdicts in favor of Maroney, the court turns to whether the amounts recovered by Maroney were either duplicative or excessive.

### 3. **Whether the Damages Awards Are Duplicative or Excessive**.

Flury argues that "[t]he special verdict form could not have been clearer in requesting that the jury separately state the amount of damages which it believed Plaintiff to have suffered on each of its claims." (Doc. 70 at 8). It nonetheless contends that the court cannot allow the verdicts to stand because Maroney failed to prove it suffered harm as a result of Flury's bad faith.

It was for the jury to decide whether Maroney suffered harm with regard to each of its claims. In doing so, the jury was instructed to consider whether and to what extent Maroney mitigated its damages, was instructed that Maroney could only recover once for its injuries, and was advised not to award any duplicative or speculative damages.

The jury found that Maroney was entitled to $50,000 on its implied contract claim thereby concluding that a larger portion of the commission was not warranted. This conclusion was not irrational as Flury not only performed the lion's share of the work with regard to the ultimate sale to ACM, but Maroney did not actively monitor or assist Flury's efforts in that regard. The jury's verdict on the implied contract claim thus reasonably reflected Maroney's quantifiable injuries.

With regard to the implied covenant of good faith and fair dealing, as noted, there was conduct by Flury wholly apart from the breach of the implied covenant which the

14

jury could reasonably conclude caused Maroney quantifiable harm. The jury determined that amount to be $50,000.

Flury has failed to cite sufficient grounds for disturbing the jury's damages verdict, or for finding it redundant or excessive. *See Nairn v. Nat'l R.R. Passenger Corp.*, 837 F.2d 565, 567 (2d Cir. 1988) (stating "[a] jury verdict is not, certainly, something lightly to be set aside," and concluding a verdict is excessive if it is so high as to "shock the judicial conscience."); *Smith v. Nat'l R.R. Passenger Corp.*, 856 F.2d 467, 472 (2d Cir. 1988) (according substantial deference to jury's findings of fact when assessing the evidence bearing on damages). Flury's motion for a new trial or to reduce the amount of the verdict is therefore DENIED.

### III.   Motion to Alter or Amend/Motion for a New Trial.

Finally, the court turns to Flury's motion in the alternative to alter or amend the judgment or to order a new trial. Pursuant to Fed. R. Civ. P. 59(e), Flury asks the court to alter or amend the judgment or order a new trial on the grounds that the court "overlooked controlling decisions or factual matters that were put before it on the underlying motion . . . and which, had they been considered, might have reasonably altered the result before the court" or "correct a clear error or prevent manifest injustice." (Doc. 68 at 2 quoting *Chet's Shoes, Inc. v. Kastner*, 710 F. Supp. 2d 436, 454 (D. Vt. 2010)).

In support of this motion, Flury revisits its motion in limine and argues that the court erred as matter of law in allowing evidence of oral negotiations in an effort to assist the jury in determining the full nature of the parties' agreement. *See Southface Condo. Owners Ass'n v. Southface Condo. Ass'n, Inc.*, 169 Vt. 243, 251-52, 733 A.2d 55, 61 (1999). The fundamental error in Flury's argument remains the same. The e-mail agreement regarding the commission for the Cranbrook set pertains only to that sale. It says nothing about the continuing relationship between the parties or what may happen with regard to an unrelated sale. Taken to its logical conclusion, Flury's approach to the parol evidence rule would bar all other evidence regarding all other sales even on completely different terms, between completely different parties, and involving a

15

completely different set of Curtis portfolios. The parol evidence rule was never intended to operate in this manner. Instead, it precludes a party from disclaiming the party's written agreement in favor of prior or contemporaneous negotiations regarding the same subject that were not reduced to writing and which alter or add to the written agreement.[7] So, for example, were Maroney to claim that the parties orally agreed to pay Kirk Rudy only $20,000 for his involvement in the Cranbrook set commission and agreed to split the remaining commission on a 60:40 basis, the parol evidence rule could be invoked to bar evidence of these prior or contemporaneous negotiations. Flury cites no evidence for extending the rule to other transactions not contemplated in the writing or for holding that if there is a writing with regard to one transaction, no oral agreement as to a different transaction may be found to exist. The parties' dealings post-dated the failed Cranbrook sale. It was with regard to these dealings that evidence in addition to the Cranbrook sale e-mails was admitted.

Because Flury has failed to identify controlling decisions or material facts which the court overlooked in ruling on Flury's motion in limine, Flury's motion for a new trial must be DENIED.

SO ORDERED.

Dated at Rutland, in the District of Vermont, this 6th day of October, 2011.

Christina Reiss, Chief Judge
United States District Court

---

[7] *See* BLACK'S LAW DICTIONARY 1227 (9th ed. 2009) defining the parol evidence rule as follows: "The common-law principle that a writing intended by the parties to be a final embodiment of their agreement cannot be modified by evidence of earlier or contemporaneous agreements that might add to, vary, or contradict the writing. This rule usu[ally] operates to prevent a party from introducing extrinsic evidence of negotiations that occurred before or while the agreement was being reduced to its final written form."